IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

------------------------------------------------------- :
UNITED STATES OF AMERICA        : CASE NO.  1:10 CR 281
                                :
                       Plaintiff :
                                :
           -vs-                 : MEMORANDUM OF OPINION AND
                                : ORDER GRANTING DEFENDANT'S
                                : MOTION TO SUPPRESS
MAURICE MILLNER                 :
                                :
                      Defendant :
------------------------------------------------------- :

UNITED STATES DISTRICT JUDGE LESLEY WELLS

Before the Court is defendant Maurice Millner's ("Mr. Millner") motion to suppress evidence seized from his person and subsequent statements he made to Cleveland Police Department officers when he was stopped and searched in front of his dwelling in the early evening of 16 June 2010.  (Doc. 12).  Pursuant to the standards laid down in Terry v. Ohio, 392 U.S. 1 (1968) and Arizona v. Johnson, __ U.S. __, 129 S.Ct. 781 (2009), Mr. Millner contends the officers lacked the necessary reasonable suspicion to either stop or frisk the Defendant -- actions that were not justified at their inception.

In its response in opposition, the government maintains the officers possessed both probable cause and reasonable suspicion to stop and frisk Mr. Millner as a consequence of his "multiple offense violations," his "nervous" and "evasive" behavior, and his presence in a "high crime area."  (Doc. 13).  In reply, Mr. Millner relies upon the recent decision in United States v. Johnson, 620 F.3d 685 (6th Cir. 2010), to challenge the evidentiary weight given, by the government, to Mr. Millner's "nervous" or "evasive" demeanor and the characterization of the neighborhood as a "high crime area."  (Doc. 14).

An evidentiary hearing was held on 1 February 2011, with counsel and defendant present.  The Court heard testimony from Cleveland Police officers Jarrod Durichko ("Officer Durichko") and Mark Worsencroft ("Officer Worsencroft") for the government, and from Gregory Brooks ("Mr. Brooks") and Defendant Millner regarding their assessment of the events surrounding Mr. Millner's arrest on 16 June 2010 for possession of a weapon under disability.  (Suppression Hearing Transcript ("TR"), pp. 1-127).

Based upon the evidence adduced at the hearing, the briefs before the Court, and the relevant law, this Court will grant the Defendant's motion to suppress.

## I.  FACTUAL BACKGROUND

The Court has gleaned the following facts from the evidence submitted.  According to the police report, prepared by Officer Durichko, both Officer Durichko and Officer Worsencroft were on routine patrol on 16 June 2010 at 5:14 pm.  Both officers were in uniform traveling in a marked Cleveland Police Department squad car.  Both

officers testified they observed Mr. Millner walking northbound on the sidewalk on E. 117th Street, approaching Sellers Road "with an open can of beer in his hand." (Tr. 15, 56; Doc. 13, Exh. 1). Both officers testified the beer was covered by a brown paper bag. Neither officer observed Mr. Millner drinking from the bag or exhibiting symptoms of intoxication. (Tr. 33, 71).

 Mr. Millner testified that he was on private property, within the fenced area of his apartment building at 459 E. 117th Street on the corner of Sellers Rd., during the entire period of his encounter with the officers. (Tr. 92-94;Govt's Ex. 1,2; Def's Ex. 1-8, location images). Images indicate the apartment building had a cyclone fencing running along the property line to the sidewalks on E. 117th and on Sellers Rd.

 The officers testified they pulled their vehicle alongside Mr. Millner, moving slowly to pace the Defendant, and Officer Durichko asked the Defendant for identification. (Tr. 17). The police report indicates, and both officers testified, that Mr. Millner "ignored" their request and, at that moment, turned from the sidewalk up the short entryway to the door of his apartment building. (Tr. 18, 59-60). Neither officer knew Mr. Millner nor that this was his residence.

 Both officers testified they then observed Mr. Millner toss the paper bag and its contents into a white plastic garbage can set against the front of the apartment building he was approaching at 459 E. 117th Street. (Tr. 37). The officers testified Mr. Millner missed the garbage can but could not recall whether he was, personally, on private property when he attempted to dispose of the bag and its contents. (Tr. 38).

 Mr. Millner testified he found a beer can in a paper bag in the bushes along the property line of the apartment when he was cleaning the yard, tossed the bag toward

3

the garbage can, but missed. (Tr. 98-99). All parties agreed the garbage can was on private property.

Both officers testified that Mr. Millner continued to the front door of the apartment building where he used his key to attempt to unlock the front door. (Tr. 22). Officer Durichko testified it was at that point when he exited the squad car and grabbed Mr. Millner's right arm to prevent him from entering the building. Id. Officer Durichko further testified that his partner, Officer Worsencroft, grabbed Mr. Millner's left arm and Officer Durichko then patted down the Defendant. (Tr. 22). Officer Worsencroft testified, alternatively, that he was parking the squad car while Officer Durichko seized Mr. Millner at the door of the apartment building. (Tr. 56). Officer Worsencroft stated that only after he parked the car did he assist his partner, and only after the two officers led Mr. Millner from the apartment building to the squad car was a pat-down performed on the Defendant. Id. Neither officer could recall whether Mr. Millner was in the front yard of the apartment building when he disposed of the bag, nor could either officer recall if Mr. Millner's keys were around his neck on a nylon strap when he attempted to open the front door of the apartment building. (Tr. 37).

Both officers testified that Mr. Millner appeared "nervous" and that he picked up his gate, mildly, which the officers demonstrated in Court. (Tr. 19, 62). While Officer Worsencroft testified that Mr. Millner appeared "nervous" and affirmed the Defendant "appear[ed] that he wanted to get away," the sum total of the "evasive" actions testified to included Mr. Millner's mildly increased pace, his turn from the sidewalk to the front door of his apartment building only a few feet from the sidewalk, and his unresponsive behavior when the officers asked for his identification. (Tr. 62).

4

Both officers testified to seizing Mr. Millner prior to his entering the front door of the apartment building.  (Tr. 22, 56).    Whether on the front steps of the apartment building or at the squad car, the officers then performed a pat-down of Mr. Millner's person.  The papers before the Court indicate that only after Mr. Millner was grabbed and patted down did Officer Durichko feel "a hard, gun shaped object in Millner's right rear pocket."  The officers retrieved the weapon, an unloaded .22 caliber handgun, and secured Mr. Millner.  (Ex. 3)

Officer Durichko testified that he "had no reason to suspect that [Mr. Millner] was armed [prior to the pat-down] other than the fact that he was trying to escape my, you know, my questioning and identifying himself." (Tr. 23).  Officer Worsencroft additionally testified they decided to pat-down Mr. Millner because the incident occurred in a high-crime area.  (Tr. 66).  Both officers testified that in their experience "9 out of 10 times," when a suspect is trying to "escape," the person is carrying either a weapon or narcotics.  (Tr. 23-24, 66).

Mr. Millner testified he found the handgun in the front yard, just prior to the officers' arrival, after being told of its presence by his young nephew.  (Tr. 93-94).  Officer Worsencroft testified that, after reading Mr. Millner his Miranda warnings, the Defendant admitted "that he found the gun in a nearby field and he was just holding onto it to turn into the police because he didn't want a kid to find it."  (Tr. 68).

## **II. LAW AND ANALYSIS**

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

5

shall not be violated,...." U.S. Const. amend. IV. This protection extends to the unreasonable seizure of persons, California v. Hodari D., 499 U.S. 621, 624 (1991), and "belongs as much to the citizen on the streets of our cities as to the homeowner closeted in his study to dispose of his secret affairs," Terry v. Ohio, 392 U.S. 1, 8-9 (1968). Of course, the Fourth Amendment does not prohibit all seizures, only those that are unreasonable. Id. at 9.

### A. Probable Cause to Arrest Mr. Millner.

Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules." Illinois v. Gates, 462 U.S. 213, 232 (1983). Probable cause exists where it is shown that, at the moment the arrest was made, the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

The government specifically maintains the officers possessed probable cause to arrest Mr. Millner for possessing an open beer can, for obstructing their investigation, and for littering the beer can and its content. (Doc. 13, pp. 9-14). Yet, testimony from the officers yielded the following credible information. Mr. Millner was carrying a brown paper bag in his right hand. Both officers suspected the bag contained a can of beer. Neither officer witnessed Mr. Millner drink from what they suspected was a can of beer. Mr. Millner turned from the sidewalk onto the short walkway to his apartment building

6

and tossed the bag he was carrying in his right hand into a plastic garbage can placed to the right of the front door to his building. Mr. Millner missed the garbage can. These observations and imputations, standing alone, do not warrant a finding of probable cause.

As to whether Mr. Millner was obstructing the officers' investigation when he did not respond to Officer Durichko's request to produce his identification, the Courts have consistently determined that, in an instance such as this, the individual is within his or her right to ignore the request. In Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), the Supreme Court held that when an officer, without reasonable suspicion or probable cause, approaches an individual, that person has a right to ignore the police and go about his or her business. Id., at 498, 103 S.Ct. 1319. Ultimately, the Court has recognized that any "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

Accordingly, probable cause fails to provide the basis upon which the government may argue that the officers reasonably affected an arrest of Mr. Millner and conducted a search of Mr. Millner's person.

### B. Reasonable Suspicion to Stop and Search Mr. Millner.

The Court next turns to the question of whether officers Durichko and Worsencroft possessed reasonable suspicion to believe that Mr. Millner had committed, was committing, or was about to commit a crime when they stopped him. Did the officers have reasonable suspicion to stop Mr. Millner, triggering the protections of the

7

Fourth Amendment, as he was attempting to unlock the front door to his apartment building?  Further, did the officers possess reasonable suspicion that Mr. Millner was armed and dangerous?

Courts have long held that a law enforcement officer who lacks probable cause sufficient to justify an arrest may briefly detain an individual for investigative purposes without violating the Fourth Amendment if the officer possesses a "reasonable suspicion that [the defendant] was engaged in wrongdoing when [the officer] encountered him." U.S. v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (courts have taken to calling these brief investigative seizures, Terry stops).  See also  United States v. Lopez-Arias, 344 F.3d 623, 627 (6th Cir.2003) (holding that "courts have recognized that a law enforcement officer who lacks probable cause to justify an arrest may nevertheless briefly detain an individual without violating the Fourth Amendment if the officer possesses a reasonable and articulable suspicion that the individual has committed a crime").

Pursuant to Terry, the police may carry out an investigative stop based upon reasonable suspicion the individual is engaged in criminal activity.  Attendant with that stop, the police may pat down an individual for weapons should their exist reasonable suspicion that the person stopped is armed and dangerous.  Terry 392 U.S. at 22-24. United States v. McDaniel, 2010 WL1253811, (6th Cir. 2 April 2010).  The Supreme Court held in Terry:

> Where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and

8

> where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

Id., at 30. The Supreme Court expounded on Terry in United States v. Cortez, 449 U.S. 411, 417-418 (1981), stating,

> [a]n investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity ... the totality of the circumstances – the whole picture – must be taken into account. Based upon that whole picture the detaining officers must have a *particularized and objective basis* for suspecting the particular person stopped of criminal activity.

United States v. Cortez, 449 U.S. 417 (emphasis added). An officer may stop a person under Terry only if he or she "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." United States v. Place, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

The government maintains that under the totality of the circumstances, the officers had the requisite reasonable suspicion to stop, seize, and subsequently search, Mr. Millner. In presenting its case, the government contends the totality of the circumstances consisted of the following elements: (1) Mr. Millner was carrying an open can of beer in a brown paper bag in violation of Cleveland city ordinance; (2) Mr. Millner littered when he threw the bag containing the can of beer onto the ground in violation of Cleveland city ordinance; (3) Mr. Millner appeared "nervous" and "evasive"; (4) Mr. Millner did not stop when called by the officers to produce identification but, instead, continued to the door of his apartment building, where he attempted to unlock his front

9

door at the moment he was seized by Officer Durichko; (5) Mr. Millner was in a high-crime area.

As to the first element, the officers' testimony indicated the lack of a basis for forming a reasonable suspicion that Mr. Millner carried an open can of beer.  Neither officer witnessed Mr. Millner partake of the beer as he walked along the sidewalk toward his apartment.  Nor were the officers able to consistently describe the contents of the bag Mr. Millner carried.  Their admittedly limited observations of the bag did not reasonably entail the conclusion that that object in the bag carried by Mr. Millner was necessarily an open can of beer.

As to the second element, the officers' testimony confirmed that Mr. Millner threw the bag he was carrying into, or near, a small white trash-can adjacent to the front door of his apartment building.  As the trash-can was, by all accounts, situated on private property, the officers lacked the reasonable suspicion necessary to conclude that Mr. Millner committed a littering offense.

Both officers testified that Mr. Millner, in the words of Officer Durichko, "seemed to become a little bit more nervous [upon noticing the squad car] and turned in a little bit of a hurried pace toward the apartment building."  (TR. 19).  Both officers demonstrated in Court, at the request of government counsel, the mildly increased rate of travel taken by Mr. Millner that caused the officers to believe he appeared "nervous."  While the Supreme Court has recognized that "nervous evasive behavior is a pertinent factor in determining reasonable suspicion," Illinois v. Wardlow, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000), the testified-to behavior of Mr. Millner does not present

10

circumstances under which his response to the arrival of the squad car could raise reasonable suspicion of wrongdoing.

From the officers' testimony, Mr. Millner mildly increased his pace along the sidewalk in the same direction he was headed when the officers initially encountered the Defendant. Mr. Millner then turned toward the front door of an apartment building located but a few feet from the sidewalk. Mr. Millner's minimal response does not raise a reasonable suspicion. See United States v. Keith, 559 F.3d 499, 505 (6th Cir. 2009) (finding no reasonable suspicion when pedestrian and car moved from one side of liquor store to other side, out of officers' sight, after pedestrian glanced twice at officers because the suspects' conduct was "more ambiguous than the examples of 'evasion' that have contributed to reasonable suspicion in other cases"); United States v. Patterson, 340 F.3d 368, 372 (6th Cir. 2003) (stating that "walking away from the police when they got out of their unmarked car constitutes a factor to be outrightly dismissed"); and Patterson v. City of Cleveland, 173 F.3d 429 (table), 1999 WL 68576, at *6 (6th Cir. 1999) (finding no reasonable suspicion when two men who appeared to exchange something separated their hands and "walked quickly up the street when a police car appeared").

As to the fourth element, the officers testified that Mr. Millner's non-responsive behavior, when asked for his identification, gave rise to a reasonable suspicion of criminal conduct. However, both officers further acknowledged that Mr. Millner was under no compulsion to stop merely because they requested his identification. (Tr. 35, 72). If Mr. Millner was under no compulsion to stop and produce identification, he was also not obstructing the officers' duties.

11

Finally, the government maintains that the officers possessed reasonable suspicion by virtue of the neighborhood being considered a "high-crime area."  The officers testified to at least one shooting within the immediate vicinity within 16 months of the officers' encounter with Mr. Millner.  (Tr. 12-13, 52-54).  To underscore the dangerous character of the vicinity around which the officers encountered Mr. Millner, the government also presented, in conclusory fashion, general crime statistics for the area, noting the fifth police district had recorded 186 felonious assaults with a firearm in 2009, and 228 gun confiscations.  (Tr. 3).

Presence in a high crime location may be considered as an element giving rise to reasonable suspicion within a "totality of the circumstances" analysis.  See United States v. Caruthers, 458 F.3d 459, 467 (6th Cir. 2006).  The Sixth Circuit has, however, directed Courts not to afford such considerations "undue weight" as general, context-based crime statistics "pertain[ ] to anyone in the [area] at that time."  United States v. See, 574 F.3d 309, 314 (6th Cir. 2009).  Reasonable suspicion, after all, must be based upon an officer's "particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).  An officer's specific encounter, such as this, within a high-crime location may contribute to a general wariness of the presence of criminal activity, but may not, standing alone, provide the basis for the specific and objective facts necessary to give rise to reasonable suspicion that the suspect is armed and dangerous.  See Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).  The testimony and papers before the Court do not support a determination of

reasonable suspicion that Mr. Millner was either engaged in a crime or was armed and dangerous.

### III. CONCLUSION

For the reasons discussed above, Mr. Millner's motion to suppress is granted.

IT IS SO ORDERED.

                                                 /s/Lesley Wells
                                        UNITED STATES DISTRICT JUDGE

Date: 7 February 2011